MEGWINOFF & LEFRANC & Co., Plaintiff and Appellee, *v.* SUNLAND BISCUIT Co., INC., Defendant and Appellant.

No. 9434.—Argued May 1, 1947.—Decided June 27, 1947.

Luis López de Victoria for appellant. Miranda & Miranda Esteve for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

This is an action originally brought in the Municipal Court of San Juan, by Megwinoff & Lefranc & Co., against the Sunland Biscuit Co., Inc. The complaint alleged, in brief, that the plaintiff contracted with the defendant for the installation of a refrigerator in the latter's factory in Hato Rey for the agreed price of $1,000, of which sum $500 would be paid at the beginning of the work and $500 at the termination thereof; that the plaintiff started the work and received from the defendant the sum of $500 and that at the termination thereof on May 5, 1944, the latter refused to pay it the sum of $499 (sic), the balance of the amount of the contract, notwithstanding the efforts made to collect it.

The Sunland Biscuit Co., Inc., in its answer alleged that although it is true that it had contracted with the plaintiff for the installation of said refrigerator in the low retarding room of its biscuit factory in Hato Rey, the contract was entered into for the installation of the refrigerator within a reasonable time; that upon the execution of the contract, it paid $500 to the plaintiff, and that the latter, negligently and notwithstanding the demands made by the defendant, did not finish the installation of said equipment until May 1944, or 2 years, 2 months, and 28 days after the execution of said contract. By way of counterclaim, it alleged that when the plaintiff accepted the order it knew that said refrigerator was urgently needed and that its prompt installation formed part of the contract; that the plaintiff violated the contract

506

by delaying its performance as already mentioned, well knowing that with such delay it caused the defendant the following damages: (1) limitation of the production of biscuits by the defendant factory; and (2) decrease in the yield of sacks of flour due to deficiencies in the fermentation process, for which the contracted refrigerator was essential; and that the damages suffered by the defendant exceed the sum of $5,000, but that in order to submit itself to the jurisdiction of the municipal court, it reduced its counterclaim to the sum of $499.

The municipal court as well as the District Court of San Juan sustained the complaint and dismissed the counterclaim. From the judgment rendered by the latter court, an appeal has been taken to this Court by the defendant, and in the brief filed by it only two errors are assigned, the first of which is that the lower court erred in holding that the plaintiff-appellee acted diligently and in good faith in the performance of the contract; and the second, that said court erred in holding that the counterclaim of the defendant did not lie.

A careful examination of the pleadings, of the oral evidence introduced, and of the correspondence between the parties regarding the contract entered into by them, lead us to the conclusion that the contentions of the appellant are not correct. From all the foregoing it appears that on February 7, 1942, the litigants herein entered into a contract by virtue of which the plaintiff would install an air conditioning equipment in defendant's factory in the ward of Hato Rey, Río Piedras, for the agreed price of $1,000, to be paid in the following manner: $500 at the execution of the contract and $500 at the completion by the plaintiff of the installation of said equipment. The agreed price included the total installation of the freezing equipment, plus free service for the period of one year. The initial $500 was paid by the defendant, who in a letter dated February 7, 1942, addressed

to the plaintiff, stated "that in accordance with our conversation, you must have ordered by air mail to the United States all the materials and machinery necessary to proceed to the installation of the equipment *within the shortest time possible.*" (Italics ours.)

Three days later, the plaintiff answered that letter by stating that all the materials required for the installation had already been ordered by air mail to the United States, and that the defendant could be assured that the installation would be made as soon as possible. On June 4 following, the defendant insisted with the plaintiff that it make the greatest efforts to obtain the remaining materials in order to be able to make the installation, and on the next day the plaintiff answered that the only part needed to make the installation was the compressor, which *"as you already know was lost in the sinking of the shipment en route New York to San Juan."* (Italics ours.) The plaintiff also informed the defendant that the order for said compressor had been immediately duplicated, but that when the compressor was ready for shipment an embargo order detained it.

From the numerous letters which the record contains it is also evident that the efforts to obtain a priority for the shipment of said compressor were to be made by the defendant, and that the latter agreed. It likewise appears that the compressor did not reach Puerto Rico until the end of May, 1943, and that due to the state of war then prevailing the installation of the air conditioning equipment could not be made until a new priority from the War Production Board were procured. Said priority was not obtained by the defendant until a short time before November 29, 1943. On said date it wrote to the plaintiff advising it "on last Friday the undersigned telephoned your office to inform Mr. Megwinoff that we had received from Washington the permit to install in our factory the equipment detailed in your letter of October 11th. . . . Since there is no obstacle now to com-

plete said contract, we would appreciate your proceeding to install said equipment.'' On the same day, the plaintiff wrote to the defendant setting forth that it hoped to be able to begin the installation work during the forthcoming week, for which reason it would appreciate that the defendant should expedite the matter of extending the priority. On January 31, 1944, the defendant wrote again to the plaintiff reminding it that the priority had already been received, that almost two months had elapsed, and requested it to proceed with the work at the shortest time possible. The record fails to show whether the plaintiff answered said letter. However, on March 2, 1944, the defendant again wrote to the plaintiff requesting the performance of the contract and advising it that *"if by next Wednesday, the 8th instant, you have not started the contracted work, we will turn the matter over to our counsel for proper action."*

From the oral evidence it also appears that the work was completed on or about May 5, 1944, and that the installation of the equipment, according to the uncontradicted testimony of Iván Megwinoff, a witness for the plaintiff, lasted 2 or 3 months.

Although in the first paragraph of the answer it is set forth that "the contract was entered into to install said refrigerator *within a reasonable time,*" we will assume, as was assumed by the parties in their correspondence and by the lower court in its opinion, that the understanding between the plaintiff and the defendant was that the refrigerating equipment would be delivered to the Sunland Biscuit Co. *"within the shortest time possible."* It was so stated by the defendant in its letter to the plaintiff of February 7, 1942, and it so appears from other letters between the parties. Now then, taking into consideration all the circumstances of this case, should we reach the conclusion that the freezing equipment was installed by Megwinoff & Lefranc & Co. in the factory that the defendant has in Hato Rey within the

shortest time possible? This question should be answered in the affirmative.

The evidence which we have summarized above, unquestionably shows that the plaintiff ordered all the refrigerating equipment by air mail immediately after the signing of the contract and the defendant paid the $500 required as initial payment; that although a large portion of the equipment promptly arrived in Puerto Rico, it was otherwise as to the compressor, which was perhaps the most important machinery needed, since the ship which carried it was sunk while making the trip from the United States to this island, and also since upon immediately ordering a new compressor an embargo order prevented its shipment, it being then necessary to obtain a permit in order to make the shipment; that said permit was obtained later on by the defendant and that the compressor did not reach Puerto Rico until the end of May, 1943; that even then a priority was required in order to be able to make the complete installation of the refrigerating equipment, and that it was not until a short time before November 29, 1943, that said priority was obtained. It is true that subsequent to that date the defendant wrote three letters to the plaintiff urging it to install the equipment, but the testimony of Mr. Megwinoff, a member of the plaintiff firm, convinces us that due to the state of war then prevailing, it was not possible to act with the desired promptness. Let us examine a part of his testimony: ". . . That compressor reached Puerto Rico on the last five days of May . . . , 1943. I have the draft which was paid to the bank and the shipping documents pertaining to said compressor. During all that time the business of Megwinoff & Lefranc had been dissolved because of the prevailing conditions in the Island at that time, which did not permit us to continue our business. We had losses. So that my partner Lefranc had to withdraw from the business. I had to take up all the obligations contracted in order to continue giving service to the

510

installations. Moreover, despite the fact that there were losses at that time and that we had also lost employees, I was called by the Army, as I was recently called again, until February 22 of this year (1945) which was the last call they had made, and I have had to leave all the work, putting aside all that I was doing in order to undergo the physical examination. So that all those things considerably delayed the execution of the different contracts one has.

"   *        *        *        *        *        *        *

"Also that was the time when the use of the freon gas, which is the gas mostly used in that unit, became acute, and although its use was restricted, said unit is designed to use that gas; hence that part of the installation was hindered, since the gas was not available for several months here; so that the unit could not be operated when there was no refrigerant and for that we had to have gas in stock. Many refrigerating units completely stopped until the shipment of gas were resumed."

The testimony of Megwinoff was not controverted in any way, and considering it we believe that the delay was not unreasonable, given the surrounding circumstances, especially taking into consideration the state of war which the United States, and even the entire world, experienced at that time.

However, we also think that special account must be taken of the additional fact that on March 2, 1944, without having made any protest whatsoever to the effect that the equipment would not be accepted, that the contract would be rescinded, or that damages would be claimed, the defendant wrote to the plaintiff advising it, as we have already stated, that "if by next Wednesday, the 8th instant, you have not started the contracted work, we will turn the matter over to our counsel for proper action." The terms of this letter were undoubtedly equivalent to an acceptance by the defendant of the situation which had existed theretofore, and

to the granting to the plaintiff of an extension which would expire on March 8, 1944. If in accordance with uncontroverted evidence the installation work lasted two or three months and the same was completed on May 5, 1944, it is logical to assume that said work was started not later than March 5 of said year, that is, within the term granted to the plaintiff by the defendant.

Moreover, it should be stated that the equipment was installed in the factory of the defendant without any protest whatsoever on the part of the latter; that on May 5, 1944, a bill was sent to it for the remaining $500; that on the 29th of that same month a letter was addressed to it demanding the payment of said sum; that on July 7 of that same year for the third time the plaintiff insisted on the payment of said sum; and that on August 4 following, for the fourth time it insisted, by letter, that the defendant pay the balance owed. The Sunland Biscuit Co. made no answer to any of these four communications. It was only in its answer to the complaint that it raised the question of breach of the contract by the plaintiff, on the ground that it did not make the installation of the refrigeration unit until 2 years, 2 months, and 28 days after the contract had been signed, and it was only then that it raised the question of the supposed damages suffered by it. This seems to us an afterthought, that is, something which the defendant thought after the occurrence of the facts. The letter of March 2, to which we have referred, besides involving an extension, was also equivalent to a waiver of any claim which the defendant might have had until then against the plaintiff.

Not only because, given the surrounding circumstances, the plaintiff acted within the shortest time possible, but also because the defendant extended the period for the installation of the equipment, waived any claim which it might have had, and because it received said equipment without any protest whatsoever, we think that the plaintiff complied with

512

the contract executed and is therefore entitled to recover the sum owed to it.

The judgment appealed from should be affirmed.[1]

---

[1] Cf. *G. H. Hammond Company* v. *Diego Agüeros & Co.*, 30 P.R.R. 567; and *Topeka Flour Mill Co.* v. *La Constancia*, 39 P.R.R. 561.